## TRAPNALL ET AL. VS. BURTON ET AL.

Where two persons bring a bill in chancery, the one claiming to be executrix and the other to be sole heir of a deceased person, asserting a right to certain lands purchased at execution sale by the testator, and the will of the deceased and the letters testamentary thereon are neither pleaded nor exhibited, and the judgment and execution under which the testator purchased are not exhibited, the bill is fatally defective.

Infant defendants must have the benefit of any defence in this court which could have been interposed for them before the chancellor.

They are deemed as having set up and relied upon the want of equity in the bill, limitation, non-claim, fraud as to subsequent purchasers, and any special defence interposed by a co-defendant not peculiar to himself, but of which each defendant was equally at liberty to avail himself.

One of the defendants having disclosed no title or interest in himself, but having confined himself to impeaching the plaintiff's title, and issue having been taken on his answer, the plaintiff waived objection to his failure to show title or interest.

Where there are infant defendants in chancery duly served with process, an affida-
vit for an appeal cannot be waived.

A cross-bill is required to be as perfect and complete as any other bill; and it or
the answer to it might as well and legitimately refer to papers in any other suit
in the court as in the original suit, and so endeavor, with statement of their
contents or exhibition of copies, to make them part of the pleadings on record.

The two suits are distinct from and independent of each other.

They merely proceed side by side, the hearing of one being delayed until the hear-
ing of the other.

It is a fundamental maxim, as well in courts of chancery as in courts of law, that
no proof can be admitted of any matter which is not noticed in the pleadings.
*Brodie vs. Skelton,* 11 *Ark.,* 134.

Defendants having referred to proceedings in another suit by way of showing an
equitable estoppel against the plaintiff, the plaintiff cannot use them to avoid
the effect of the statute of limitation, not having pleaded them in the bill.

St. John's college having been undertaken by the Grand Lodge of Free Masons and
the masonic fraternity of Arkansas, a person who was á mason when he testified,
and one of the trustees of the college, but without any personal or pecuniary
interest in the controversy, is not incompetent as a witness for the college.

More than a year having elapsed after the disimissal of one suit, before the begin-
ning of another by the same parties, the former suit cannot be urged to remove
the bar of the statute of limitations.

When a new statute of limitations is enacted, it will be taken to be prospective in
its operation, and to apply not to causes of action which had occurred at its pas-
sage, but to those occurring thereafter, in the absence of language in the statute
compelling a contrary construction; and all causes of action existing at the time
of the new act are governed as to the length of time necessary to constitute the
bar, by the old law and not by the new.   *Couch vs. McKee,* 6 *Ark.,* 484, *and
other cases cited.*

When the complainant's remedy is barred by limitation on the face of the bill, and
he fails to allege anything in avoidance of the defence, and the answer contains
a demurrer, the objection is fatal at the hearing. *Sullivan vs. Hadley,* 15
*Ark.,* 129.

The old statute of limitations (*Eng. Dig.,* 695, *sec.* 14,) provides that no action for
the recovery or possession of lands should be maintained, unless it appeared
that the plaintiff, his ancestor, predecessor, or grantor was seized or possessed of
them within ten years before the commencement of such suit.

To bar the plaintiff's claim *actual* possession must be shown by the defendant; lapse
of time and actual possession must unite.

The possession must be so open and exclusive as to amount to a disseisin; or an
ouster or termination of the plaintiff's possession.

The acts of the defendant must be plain and unmistakable and such as prove his intention to use the land as owner.

Where A buys B's land under execution, he is barred if he does not gain actual possession within ten years.

To recover the possession of land, under our statute of ten years, the plaintiff must have had actual or constructive possession within that time. If the execution purchaser does not obtain actual possession, and the defendant in the execution continues in it without agreement to hold under him, the purchaser has no constructive possession.

Constructive possession by the plaintiff is sufficient; and if he proves that, then the defendant must prove by sufficient acts that more than ten years before suit he took actual possession and continued it, adversely, so as to put an end to the constructive possession; and that the latter has not been renewed.

Where the defendant in execution conveyed the lands in controversy with covenants which guaranteed, not only the absolute title in fee, but the immediate, continued and exclusive possession against all claims of all persons whatever, this was the clearest possible declaration that he claimed the land, or all the interest he ever had in it, as his own.

If this conveyance and these covenants did not fix the character of his possession as adverse from the beginning, they made it, at least, adverse from that time forward.

Where process is not sued out against several parties, who have an existing legal interest in the lands whereof partition is asked, the bill must be dismissed at the hearing.

The case stood precisely as if the bill had not sought to make them parties.

One of the plaintiff's having sued as executrix and the other as sole heir of the testator, for the defendants to admit this relationship between the plaintiffs and the testator, was not to admit that the latter, being sole *heir*, had any rights in the lands in question under the will.

If a person who has the claim to, or is the owner of property real or personal, stands by and permits it to be sold, without giving notice of or asserting his right, he is estopped from setting up his claim or title against the purchaser. *Shall vs. Biscoe*, 18 *Ark.*, 142.

Where any of the parties have died after the cause has been submitted in this court, the court will order its decree to relate to the day of submission.

*Appeal from Pulaski Chancery Court.*

Hon. H. F. FAIRCHILD, Chancellor.

GARLAND & RANDOLPH, for appellants.

WATKINS and WILLIAMS, for Kimber's heirs and the trustees.

S. H. HEMPSTEAD, for Vance.

Opinion prepared by A. PIKE, ESQ.—*See note, page* VIII.

This case comes here on appeal from the chancery court of Pulaski county.

On the 8th of February, 1858, Martha F., and Mary R. Trapnall, the former described as "executrix of the last will and testament of Frederic W. Trapnall, deceased," and the latter as "infant and sole heir of the said Frederic W. Trapnall, by her guardian *ad litem*, Charles A. Carroll, by the court appointed," filed their "bill of complaint and cross-bill against Edwin Kinder and several others; and on the 22d of June, 1858, their amended bill, taking the place of the original, Henry Edwin Burton, *alias* Edward Kinder, William Burton, Elijah A. More, Roderick L. Dodge, Robert A. Watkins, Thomas H. Kimber, the trustees of St. John's College, William Vance, Richard C. Hawkins, Noah H. Badgett, William Bronaugh and Sarah A. Bronaugh were made defendants.

The bill stated, that the first named defendant, Burton *alias* Kinder, had filed his bill of complaint, to October term, 1857 of the same court, against the complainants and others, to which the complainants had filed answer and cross-bill, and had permission to amend.

That on the 18th of September, 1841, Samuel Evans recovered judgment in the Pulaski circuit court against Richard C. Hawkins and two others for $232 96-100 debt, with interest at 10 per cent. from December 22d, 1840 till paid and costs: that an *alias fi. fa.* issued on this judgment, on the 29th of August, 1844, which became returnable by law to April term 1845, and was levied on the 3d of September, 1844, on the north-east quarter, the north-west fractional quarter, and the south-west quarter, of section eleven, in township one north, of range twelve west, as the property of Richard C. Hawkins; which, after due advertisement,

OF THE STATE OF ARKANSAS. 375

TERM, 1866.]          Trapnall et al .vs. Burton et al.

were sold under the execution, on the first day of the April term 1845, in separate tracts, and purchased by Frederic.W. Trapnall, for the sum, in the aggregate, of $274, and that, on the 8th of May, 1845, the sheriff duly executed and acknowledged in open court his deed for said lands, which was afterwards duly recorded.

A copy of the deed is exhibited.

That on the 21st of May, 1834, these lands were patented to Noah H. Badgett, Jesse B. Badgett, William Badgett and Richard C. Hawkins, jointly.

That on the 9th of May, 1837, the patentees sold thirty acres of the north-west fractional quarter to the United States. A copy of the conveyance, it is stated, is filed with the answer of one of the complainants to Kinder's bill.

That on the 3d of April, 1838, Jesse B. Badgett and William Badgett mortgaged their undivided moiety of the lands, to secure a debt afterwards assigned to James Vance, who, on the 27th of June, 1846, obtained a decree foreclosing the mortgage, and William Vance purchased the whole interest of Jesse B. and William Badgett at commissioner's sale under the decree.

That on the 26th of May, 1846, Noah H. Badgett and Hawkins and their wives, conveyed the north-east quarter to William Burton, who received the conveyance with full knowledge of the sheriff's sale and conveyance to Trapnall.

That on the 19th of May, 1847, Burton, by his attorney, William A. Bronaugh, conveyed to Thomas H. Kimber the west half of the said north-east quarter, who received the same with full knowledge of the sheriff's sale and conveyance to Trapnall.

That Kimber took possession of the west half "and continued to keep possession until he sold and conveyed the same to the trustees of St. Johns' College, who are now asserting possession and erecting a college building thereon."

That when Vance made his purchase, it was agreed between him and Noah H. Badgett, that he should take the north-west and south-west fractional quarters for his entire interest in the lands.

That long before Evans' judgment was obtained, Hawkins had made a clearing and improvement on the west half of the north-east quarter, and built a house on it and occupied the same several years, with the express understanding between him and Noah H. and Jesse B. Badgett, [William Badgett having died without children, and his brothers and sister being his only heirs,] that he was to have the said west half quarter as his separate share of said lands; but no deeds of partition were made, and the lands remained in possession of the partnership, all holding under the patent as tenants in common, and subject to partition, when agreed on or decreed.

The complainants had hoped that Burton, Kimber and the trustees of the college would have acknowledged Trapnall's paramount title, and admitted him to possession; but as they refuse, alleging that the complainants have no title, the bill prays that the defendants may answer, and that the conveyances to Burton, Kimber, and the trustees may be set aside as to the west half, and that the lands may be divided and deeds of partition made, and the west half of the north-east quarter assigned to complainants, " and as much more as shall be meet and proper," and title thereto be quieted, and possession of the same be returned to them, with such other and further relief as to equity and the premises belongs.

This is the whole bill. Its defects are obvious and fatal. The will of Trapnall is not pleaded or exhibited, nor are the letters testamentary granted to Mrs. Trapnall. When he died, what relationship she bore to him, or what relationship Mary R. Trapnall bore to him is not pleaded. The latter sues as sole heir, and not as devisee; and in the absence of any statement as to the will, she is not shown to have any interest in the lands in controversy. The judgment and execution under which Trapnall purchased are not exhibited.

Trapnall purchased early in April, 1845. The bill was filed on the 8th of February, 1858, nearly thirteen years after his right of action accrued, and more than seven years after the passage of

OF THE STATE OF ARKANSAS. 377

TERM, 1866.]            Trapnall et al. vs. Burton et al.

the limitation act of 4th January, 1851. Yet no excuse is given for this long delay, in order to avoid the statute bar.

It is not shown what interest Kinder claims in the lands; there is nothing in the bill that connects More, Dodge, Watkins or Sarah A. Bronaugh with the matters in controversy ; and William Bronaugh figures merely as the attorney in fact by whom Burton conveys to Kimber.

Though no process was issued, Kinder appeared and answered the bill on the 6th of July, 1858. Kimber's widow and one heir, and Dodge, Watkins, and the trustees entered their appearance on the 14th of October, 1853, and answered afterwards ; and a guardian *ad litem* filed an answer for the minor heirs of Kimber on the 11th of February, 1859. William Burton, Elijah A. More, Vance, Hawkins, Noah H. Badgett, and William and Sarah A. Bronaugh never appeared. For although the decree states that "this day appeared the several parties to the original and cross-bill in this cause," that must be confined to such of them as had already entered their appearance, since no others were under any legal obligation to appear; nor, indeed, there being no process or order of publication, was there any suit pending against any of the others.

It appeared by the answers of Dodge and Watkins, and is proven, that on the 3d of June, 1847, William Burton conveyed to Elijah A. More, the east half of the north-east quarter, and that More conveyed one half of that to Dodge, on the 27th of October, 1851, and the other half to Watkins, on the 29th of November, 1852.

The minor heirs of Kimber must, of course, have the benefit here of every defence, which could have been interposed for them before the chancellor. They are to be deemed as having set up and relied upon the want of equity in the bill, limitation, non-claim, fraud as to subsequent purchasers, and any special defence interposed by a co-defendant, not peculiar to himself, but of which each defendant was equally at liberty to avail himself.

Kinder demurred to the bill, by proper clause in his answer.

Dodge and Watkins, and the widow and adult heir of Kimber demurred in the same way, and relied on the statute of limitation ; and the trustees of St. John's College relied upon those statutes.

As any defence maintained at the hearing and valid as to one defendant, being general and not personal to himself, was sufficient to defeat the complainant's case as to all, we need not refer in detail to the allegations or denials of the several answers.

Kinder disclosed no title or interest in himself, but confined himself to impeaching Trapnall's title. As issue was taken on his answer, the complainants waived objection to his failure to show title or interest. Dodge, Watkins, and Kimber's heirs and widow allege in defence, that Trapnall, after his purchase, held Hawkins' interest in the land as and by way of security for the Evans debt, and other debts of Hawkins, held by him as an attorney at law for collection, which debts were afterwards fully paid. It is alleged by one of the answers that after his purchase, Hawkins sold to Henry M. Rector, a dwelling house and grounds in Little Rock, in part consideration for which Rector undertook and agreed to pay, and did pay those debts.

The answers also present by way of defence the allegations that Trapnall never had any possession under his purchase ; that Hawkins continued in adverse peaceable and undisturbed possession, and transferred that possession to Burton, who transferred it to his vendees ; that Watkins, Dodge and the trustees received possession, upon their purchases of the premises conveyed to them, and ever after retained that possession ; and that the purchase of each was made in good faith without actual notice of Trapnall's purchase by any of them except the trustees.

The Trustees of St. John's College are by law a corporation, sued and answering by their corporate name; and they made the following statement in their answer, and fully proved it at the hearing : that when the agents of the corporation were in treaty for the purchase of the land, and before the purchase was concluded, one of the agents called on Trapnall, and informed him of the pending negotiation and inquired of him as to his claim

under his purchase at sheriff's sale, under the Evans execution, telling him that the trustees would not purchose if he set up any claim to the land under that sale. The reason for this was, that he then had a suit pending in the Pulaski circuit court, in chancery, against Kimber, asserting his title under the sheriff's sale. Trapnall explained that he did not want or expect to recover the land, but that the object of his suit was to coerce payment of a residue, of between $400 and $600, of a judgment he had against Hawkins, and which Mr. Rector had assumed to pay, as part of the consideration of his purchase from Hawkins of a certain dwelling house and lot in Little Rock; but which he had refused or failed to pay. Mr. Rector, on inquiring of him, stated that he did not deny his assumption some years before for Hawkins to Trapnall, but claimed that the latter as surety for costs, owed him a large sum [Rector having been the marshal of the United States] for such costs, which Rector wished settled. Afterwards, Trapnall's suit was dismissed: and the trustees supposed that his claim was abandoned. They had full notice of the claim, and made the purchase and the deferred payments with the confident expectation that he did not claim the land itself, or any interest in it, save as a means of enforcing a moneyed demand, which, as between him and Rector, had became barred by limitation, and seemed to have created ill feeling between them. Trapnall was a warm fried of the undertaking to build the college, and declared that he did not wish to throw any obstacle in the way of the proposed purchase from Kimber. With that understanding, and on the faith of those assurances, the purchase was made.

This cause and that on Kinder's bill were heard together, and the two decrees are contained in one record entry. Each bill was "dismissed for want of equity"; and the complainants in cross-bill appealed, "the affidavit required by the statute being waived."

If the infant heirs of Kimber had been legally made parties, by service of process, so that a decree below or here would bind

them, the afficevit could not have been waived. The trustees paid Kimber $5,500 for the land purchased by them, and if Trap-nall recovered it, they would be entitled to recover of Kimber's estate that sum and interest on the covenants in Kimber's deed, running with the land. If they were parties, and to be bound by decree, the appeal would be dismissed. But as they are not, we are at liberty to consider the merits of the case.

The suit on the cross-bill was heard, it is stated by the record, on the original and amended bill and exhibits ;and a transcript of the record of the suit brought by Trapnall against Kimber and others ; on the answers to the cross-bill, and replications to these answers ; and on the testimony introduced by each defendant, by documents and depositions in the original cause. The answers also referred to the answers of the respective respondents to Kinder's bill, for statement of the title of each, and made these answers part of themselves. If it had been indispensable for Dodge, Watkins and the trustees to set out their titles with particularity, this mode of pleading would have been vicious. It was not indispensable, the bill being fatally defective on its face; but such pleading is not to be encouraged. A cross-bill is required to be as perfect and complete within itself as any other bill ; and it or the answers to it might as well and legitimately refer to papers in any other suit in the court as in the original suit, and to endeavor without statement of their contents or exhibition of copies, to make them part of the pleading on record. The two suits are distinct from and independent of each other. They merely proceed side by side, the hearing of one being delayed until the hearing of the other. It is a great error to imagine that accurate and systematic pleading is not quite as necessary in equity as at law. True, much of the prolixity and repetition of the old forms may profitably be omitted; but to dispense with all form and regularity of pleading should not be permitted by a chancellor. Far better adhere to the old forms with punctilious accuracy, than indulge in pleadings like the bill in the present case.

The fruit of the erroneous pleading and vicious proceeding allowed, is, that although Kinder has not brought his case here by appeal, and we have nothing before us but the cross-suit, the whole record of both sides has come up to us in one transcript, to the great increase of costs and of the labor of the court. As to so much of the pleadings and record of Kinder's suit, as is not specially referred to and made part of the pleadings or record of the suit now before us, the pages are to us as if they were blank, and they can give us no judicial knowledge of any thing they contain.

It is a fundamental maxim as well in this court as in the courts of law, that no proof can be admitted of any matter which is not noticed in the pleadings. 2 *Daniell*, 992 ; *Story, Eq. Pl.*, § 257, 258 ; *Whaley vs. Norton*, 1 *Vern.*, 483 ; *Gordon vs. Gordon*, 3 *Swanst.*, 472 ; *Clark vs. Turton*, 11 *Ves.*, 240 ; *Williams vs. Llewellyn*, 2 *Younge & Jer.*, 68 ; *Hall vs. Maltby*, 6 *Price*, 240, 259 ; *Montesquieu vs. Sandays*, 18 *Ves.*, 302 ; *Powys vs. Mansfield*, 6 *Sim.*, 565 ; *Langdon vs. Goddard*, 2 *Story*, 267 ; *James vs. McKenin*, 6 *John R.*, 543 ; *Lyon vs. Talmadge*, 14 *id.*, 501 ; *Barque Chuson*, 2 *Story* 456 ; *Harding vs. Handy*, 11 *Wheat.*, 103 ; *Brodie vs. Skelton*, 11 *Ark.*, 134.

Sir ANTHONY HART said, in *Farrell vs. ———*, 1 *Malloy*, 353. "LORD TALBOT said, long ago, that if you are to oust a defendant for fraud alleged against him, and the fraud is proved by the acknowledgment of the defendant that he had no right to the matter of litigation, the plaintiff must charge that, on the record, to give him the opportunity to deny or explain and avoid." To allege and not prove, benefits a party quite as much as to prove and not allege.

The suit instituted by Trapnall referred to in the answer of the trustees, is not mentioned or alluded to in the bill. It can only be referred to in connection with the testimony in support of the equitable estoppel relied upon in the answer. The complainants cannot use it to avoid the effect of the statute of limitations. They have not pleaded it.

Of the testimony in the case it is only material to say :

That the allegations of the answer of the trustees in regard to what occurred between the agent of the college and Trapnall, before the trustees purchased, are at all points sustained by the testimony of George C. Watkins. Some question was raised as to his competency. St. John's College was undertaken by the Grand Lodge of Free Masons, and the masonic fraternity of Arkansas. Mr. Watkins was a mason, when he testified, and one of the trustees, but without any personal or pecuniary interest in the controversy. It is very clear that he was not incompetent to testify.

It was proven that Hawkins took possession of the west half of the north-east quarter, about 1840, and cleared a field of twenty or thirty acres on it, and built a house on another tract near it : that he occupied this place until he had sold to Burton and Burton to Kimber. Then Kimber took possession, and lived on and cultivated the land until he sold to the trustees, who thenceforward had possession, and proceeded to erect a college building upon it.

The prior suit, referred to above, was brought by Trapnall on the 11th of March, 1850, and the allegations of the bill are precisely the same as those of the amended bill in this case. William Vance, William Burton, Kimber and Noah H. Badgett were alone made defendants. The relief prayed was precisely as in the present suit. Kimber, Badgett and Vance were served with process, and order of publication was taken as to Burton. Kimber demurred to the bill, and Trapnall, in July, 1850, took leave to amend it. Nothing more was done until the 16th of February, 1854, when Trapnall's death was suggested, and the suit ordered to stand revived and progress in the names of the present appellants. On the 22d of December, 1854, they dismissed the suit.

Though the chancellor dismissed the bill for want of equity, he decided it upon the pleadings and testimony, on the ground of adverse possession of the whole north-east quarter in Hawkins

and others, from the date of Trapnall's purchase; and also, as to the west half, on the ground of equitable estoppel.

The bill does not pretend that Trapnall ever had actual possession of any part of the land. It states that Hawkins had cleared part of the west half, built on it and occupied it, with the understanding that he was to have that for his share; but no partition was effected, and the land remained in possession of the joint owners as tenants in common. It alleges that Burton, Kimber and the trustees, refused to recognize Trapnall's title, or *admit him to possession;* and it prays that possession of not only the west half, but of so much more as may be decreed, may be returned to the complainants.

The proof of continuous adverse possession of the west half of the north-east quarter, is full and ample; and we do not think it necessary to inquire whether the proof of such possession of the other half, and the quarter purchased by Vance, is conclusive or not.

When the bill was filed, the persons holding paper title to portions of the lands were, as the bill and answers show, Noah H. Badgett, William Vance, the Trustees of the College and Dodge and Watkins. These were the only necessary parties so far as the bill was brought for partition of the lands. The trustees, Dodge and Watkins undeniably have title, under the conveyance from Badgett and Hawkins to Burton, to Badgett's interest of one-fourth in the respective tracts purchased by them.

Trapnall's title dates from 21st April, 1845. He instituted his first suit on the 11th of January, 1850, and these complainants dismissed it on the 22d of December, 1854. This suit was commenced on the 8th of February, 1858. More than a year having elapsed after the dismissal of the former suit, it is as if that suit had never been brought; besides that, as we have already said, this former suit is not mentioned in the bill, and therefore could not be resorted to for any purpose by the complainants, in any event.

Vance obtained his title on the 27th of June, 1846, under a

mortgage dated the 3d of April, 1835; the trustees, on the 17th of July, 1852; Dodge, on the 27th of October, 1851, and Watkins, on the 29th of November, 1852.

From the time of his purchase, Trapnall permitted Hawkins to remain in possession of the half quarter, which he claims was to be his share, without attempting to obtain possession, by any proceeding whatever, or to put an end to the tenancy in common, created by his purchase, between him and Vance, and Noah H. Badgett. He lies still a year, until Badgett and Hawkins sell the north-east quarter in May, 1846, to Burton; and then again another year, until, in May, 1847, Burton sold to Kimber; and then again nearly three years, when he instituted a suit on a bill as grossly defective as the one in this case, took leave to amend it in July, 1850, and let the suit sleep until his death, in 1853. Then these complainants revive it in February, 1854; and although, in the meantime in 1851 and 1852, Dodge, Watkins and the trustees have purchased parts of the north-east quarter, and placed their conveyances of record, these are not made parties, until, late in December, 1854, the suit is dismissed voluntarily by these complainants, and the matter sleeps again more than three years, and this suit is at last only instituted under the spur of the bill filed by Kinder. Hawkins, Burton, Kimber, the trustees, Dodge, and Watkins are all allowed peaceably to take and receive possession; the trustees building on the land and adding value to it, erecting an institution of learning by voluntary contribution from the masonic fraternity and citizens. No explanation is offered for this neglect of Trapnall, to enforce his pretended rights, none to explain Hawkins' continuance in possession, or reconcile it with Trapnall's proprietorship. While the former suit sleeps, the stringent limitation act of 1851, is enacted; yet it still sleeps, regardless of the menaces of that statute.

The question in this case, as in many others, is not so much whether Trapnall has a title, as whether equity will lend him its aid to make that title available. One must use even what

is his own, so as not to injure others. Equity does not minister to iniquity.

Until the 4th of January, 1851, ten years was the time requisite to create a bar to the recovery of real estate.

It is too well settled in this court for the doctrine to be now disturbed, that when a new statute of limitations is enacted, it will be taken to be prospective in its operation, and to apply, not to causes of action which had accrued at its passage, but to those accruing thereafter, in the absence of language in the statute compelling a contrary construction; and that all causes of action existing at the time of the passage of the new act, are governed, as to the length of time necessary to constitute the bar, by the old law and not by the new.

This explanation of the law, in *Couch vs. McKee*, 6 *Ark.*, 484, and *Hawkins vs. Campbell, id.*, 513, was not predicated, it was declared in *Calvert vs. Lowell*, 10 *Ark.*, 147, upon any supposed connection between the contract and the act of limitations in force at the time of its inception, whereby the law of prescription then in force entered into or became one of the terms of the contract; but it was the simple ascertainment, by means of construction, of the intention of the legislature, the court being guided by the presumption that all laws are prospective and not retrospective; and resting his opinion mainly on the prospective language of the statute and the dubious meaning of its repealing section in reference to laws in force at the time of its passage. That the result of this doctrine is, that two different laws are held to be at one and the same time in force, was not considered so great an anomaly as to forbid the establishment of the doctrine, and was shown to be the case elsewhere.

In *Davis vs. Sullivan*, 7 *Ark.*, 449, it was expressly adjudicated that, in regard to bonds, the act of 1839, was the rule for a case, where the bar was not complete on the passage of the act of December, 1844. And the same doctrine was recognized in *Wilson vs. Keller*, 8 *Ark.*, 508; *Carneal vs. Thompson et al.*, 9 *Ark.*, 55; and *Ringgold et al. vs. Dunn*, 8 *Ark.*, 497. The same doc-

26

trine was adhered to in *Biscoe et al., vs. Stone et al.*, 11 *Ark*, 39: and in *Durritt vs. Trammell, id.*, 183, it was held, that where the cause of action accrued under the old law, part payment made after the passage of the new law did not take the case out of the former act, and place it within the latter, which extended the term for limitation. In *Sullivan vs. Hadley*, 16 *Ark.*, 129, the doctrine was again applied, as it had been in *Mason vs. Howell*, 14 *Ark.*, 199, and *Bank of the State vs. Gray*, 13 *id.*, 39.

In *Couch vs. McKee* and *Hawkins vs. Campbell*, the bar under the old statute had become complete before the passage of the new law. So it had in *Davis vs. Sullivan*. But in *Calvert vs. Lowell, Wilson vs. Keller, Durritt vs. Trammell, Biscoe vs. Stone* and *Sullivan vs. Hadley*, that was not the case.

The statute of 4th January, 1851, it is true, declares that all laws inconsistent with its provisions are repealed; and therefore it is urged that the former law is wholly annulled, and can no longer be relied on in any case or for any purpose. But in *Hawkins vs. Campbell* this court said that the act of December, 1844, did not, by express words, repeal any other portion of the 9th chapter of the Revised Statutes than certain specified sections, " and other parts of that chapter which come in conflict with that act." " The sixth section," the court said, " is not repealed by express words: and the question then recurs, does it conflict with the provisions of the act of 1844? *So far as it relates to demands accruing after its passage*, the first is by the operation of the last restricted to demands previously existing." And this construction of the repealing clause was adopted in *Calvert vs. Lowell*.

If these questions were not already settled we should give our statutes the same construction. The object of the act of 4th January, 1851, was to reduce the time necessary to bar a suit for the recovery of lands, from ten years to seven; and not to lengthen the time in any case. If, as the counsel for the appellants thinks, the new statute governs *all* cases, then if A had a right of action for lands, which accrued on the 5th of January, 1841, and would have been barred the day after the new law passed, the effect of

that law was to give him seven years more, less one day, in which to sue. The statute did not intend this absurd consequence, any more than it intended to cut off the right of action at once, where it had accrued *more* than seven years before the passage of the new act. It provides "that no person or persons or their heirs shall have, sue or maintain any action or suit, either in law or equity, for any lands, tenements or hereditaments, but within seven years next after his, her or their right to commence, have or maintain such suit *shall have come, fallen* or *accrued:* and that all suits, either in law or equity, for the recovery of any lands, tenements or hereditaments, shall be had and sued within seven years next after title or cause of action accrued, and no time after said seven years shall have passed:" with a proviso that if any person "be or shall be, at the time said right or title first accrued, come or fallen" within the age of twenty-one years etc.

The language of the act leaves no doubt that it provides only for future cases. It does not say, "Provided such person *was*, when the cause of action accrued;" so as to cover any disability existing *before* its passage.

But it is said that the effect of a statute of limitation upon causes of action *existing* at the time of its passage, is the same as upon those accruing on the day it took effect. *Baldwin vs. Cross* 5 *Ark.*, 510; *The People vs. Supervisors of Columbia College*, 10, *Wend.*, 365. Undoubtedly: so far as this, that existing causes of action are barred, in any event, in seven years from its date, if not barred sooner under the law in force when they accrued. The statute creates a new rule ; and the essence of a new rule is, that it forms a law for future cases. It applies to old cases, but not till the expiration of the fixed time from and after it takes effect. It could not be pleaded until after the 4th of January, 1858, in any case. If then there was a cause of action existing, not barred by the old statute, but to which the new one applied, it could be pleaded. See *Sayre vs. Wisnor*, 8 *Wend.*, 661; *Fairbanks vs. Wood*, 17 *Wend.*, 330; *Eakin vs. Ramb*, 12 *Serg. & Rawle.*, 330. If a right of action accrued on the 30th January,

1851, and another on the 5th of same month, the term of limitation of the former was not ten years, less a day, after the passage of the act, and that of the latter seven years and a day from the same. No such absurd consequence was intended. The former would be barred in seven years from the date of the law, though ten years had not elapsed from its accrual. The former law governs, until the time fixed by the new law expires, after its passage, and then the new law applies to all cases not then barred by the old law.

In *Conway vs. Kinsworthy*, 21 *Ark.*, 9, it was held that where a party having an equitable interest in land did not file his bill to establish and quiet his title to it, for thirteen years from the time when his right to bring his suit accrued; and he made no proof that during that time he asserted any claim to the land, paid taxes on it, or exercised any dominion over it, and the defendant and those under whom he claimed had, for more than the period of limitation held the legal title, exercised dominion over the land, paid the taxes on it, and openly claimed it as their own, under a title conflicting with that of the complainant, his bill was properly dismissed for want of equity. The defendants had had no actual residence or improvements on the land, and the lands being wild and unimproved, it was not necessary for them to actually go upon them, and enclose or improve them, they having the legal title, in order to constitute such adverse possession as would cause the statute to commence running in their favor. Open and notorious acts of ownership were sufficient. Adverse possession is possession in opposition to the title of another, or rather, in non-recognition of his title. A forcible disseizin will commence it. Where there is no actual *possessio pedis*, there must be a claim of title adverse to the other party, or in one's own right.

In *Guthrie vs. Field*, 21 *Ark.*, 379, a bill to foreclose a mortgage executed in 1833, was brought in 1850, the mortgagor of the land having been in possession, as appeared in evidence, at least from the year 1843; which appeared by his having made

other mortgages of the land, reserving the right to retain possession. It was contended that he had not been in possession, as far as appeared, long enough to bar an ejectment, or indeed for any length of time, and that in the absence of such a showing, the law presumed the possession to have been with the mortgagee, in whom the mortgage vested the legal title. Both the bill and answer were totally silent as to possession. The court neither admitted nor denied the legal presumption that possession was with the mortgagee: but said there was evidence to prove that he did not go into possession of the premises upon the execution of the mortgage, or at least did not retain it long enough to mature a title against the mortgagor, and that the legal presumption was overturned. The truth is that there is no such legal presumption, in case of a mortgage of land; which is now regarded, both at law and in equity, as a mere security for a debt. Where a person takes an absolute conveyance of land, the legal presumption is that the grantor gives him possession, because he is entitled to it, it is consistent with his title and the intention of the conveyance, it is almost always the case that he takes possession, he purchases the land in order to get possession, and takes covenants to secure him in it. Therefore, in the absence of proof either way, it is reasonable to suppose he takes possession; indeed, it is unreasonable and contrary to universal experience to suppose he does not: and therefore the law is said to *presume* that he does so. There are no such reasons to create such a presumption in favor of a mortgagee. On the contrary, the reasonable presumption is just the other way; and so it is in the case of an execution purchaser, because though he has the legal title and generally desires possession, the former owner is not presumed to desire to yield it to him, nor is it common for him to do so until compelled.

In the case cited, the defendant in effect pleaded the statute; and the complainant took issue. This, the court said, threw the burden of proof on the complainant: and as he failed to adduce such testimony as would take the case out of the operation of lapse of time, as set up in analogy to the statute, the plea stood confessed, and the bill was properly dismissed.

Where the complainant's remedy is barred by limitation, on the face of the bill, and he fails to allege anything in avoidance of the defence, and the answer contains a demurrer, the objection is fatal at the hearing. *Sullivan vs. Hadley*, 16 *Ark.*, 129. And it needs, at this day, no citation of authorities to show that such a bill as the present, setting up a claim that had so long slumbered, and giving no reason or excuse for the delay, but admitting that the party had never even had possession, could properly be dismissed for want of equity and as a stale claim, without a hearing; unless there be something in the doctrine as to the necessity of proof of continuous adverse possession, which can aid the complainant's case. In *Guthrie vs. Field*, nothing of that kind was proven, except that, ten years after the execution of the mortgage which it was sought to foreclose, the mortgagor executed two other mortgages to other parties, stipulating in each for retention of possession of the land. These were not necessarily acts adverse to the title of the first mortgagee, or done under claim of title in conflict with his: because a mortgagor may mortgage the same land again and again, without thereby impeaching the validity of the first mortgage. The execution of the subsequent mortgages, therefore, only proved continuance of possession by the mortgagor, not adverse possession, and the bill did not allege that possession ever was had or obtained by the mortgagee com plainant.

The whole doctrine of adverse possession is in a condition of doubt and confusion, which is a shame to the law; and it would be almost, if not quite impossible, by weighing the cases against each other and giving equal weight to each, to extract from them an intelligible, consistent and rational body of doctrine. "Distressing conflicts of opinion," on many questions, are inevitable, when, besides the English courts and the supreme court of the United States, from twenty to thirty state courts have been engaged for half a century in expounding a doctrine affecting the rights of parties in a multitude of suits. As the multiplicity of tribunals and the contrarieties of their decisions make it now im-

possible for a court to bow to any particular case, decided by
another court as a binding "authority," in the English sense of
that word, and as we are thus constrained, in many cases, to com-
pare the decisions and weigh one against the other, judging of
each by the rules of reason and logic and not without regard
to the rank and character of the courts pronouncing them, we
must often adopt, not that doctrine which is sustained by the
greatest number of cases, but that which is most in accordance
with sound sense, judicial reason and legal logic.

It will at some time become necessary to re-examine the whole
doctrine of adverse possession, and to endeavor to place it on the
stable foundation of a few undeniable legal principles. We do
not undertake that now. Our present statute of limitations in
regard to suits for recovery of lands, like the former statute, says
nothing whatever in regard to the possession of the defendant;
but broadly provides that no person shall sue or maintain a suit
at law or in equity, for lands, after the expiration of seven years
from the time when his right to commence, have or maintain such
a suit shall have come, fallen or accrued. By our statute, in
force when Trapnall purchased, and ever since then, if Hawkins
refused to give him possession, he could, on motion, have had an
order of the court, under which the sheriff would without delay
have put him in possession, *Gould* 514, *sec.* 80; and this pro-
ceeding was a suit or action; because an appeal lay from, or a
writ of error to, such order for possession; and because the aver-
ments in the petition were traversable and issuable. *Etter vs.
Smith*, 5 *Ark.*, 90; *Fitzgerald vs. Beebe*, 7 *Ark.*, 310; *Ferguson
vs. Blakeney*, 6 *Ark.*, 296.

The old statute [*English*, 695, *sec.* 1] provided that no action
for the recovery of lands, or of the possession of lands, shall be
maintained, unless it appeared that the plaintiff, his ancestor,
predecessor or grantor was seized or possessed of them within ten
years before the commencement of such suit. Upon the mere
language of this and statutes in similar words, the natural con-
struction would seem to be, that the plaintiff must show seizin or

possession by himself within ten years before suit; and that if constructive possession, as following title, were sufficient, yet, to defeat him, the defendant would only need to show actual possession in himself, which, as there could not be two possessions at one and the same time, would prove the non-existence of such constructive possession, or of *presumed* possession as the natural accompaniment of title. But the courts have carried the presumption farther; and have held that where A has absolute title, and B is in possession, as A is entitled to the possession, B's possession will be *presumed* to be under A, or not in denial of his title, unless B shows the contrary, by proving what is called *adverse* possession, that is, possession with non-recognition of A's title. If B took possession by force, that shows such non-recognition. An infinite variety of acts may show the same, and repel the presumption that B holds under A, or does not respect and acknowledge, but denies, contemns or disregards his title: in other words, holds for himself, meaning to keep possession, whether A is willing or not.

Of course *actual* possession by the defendant must be shown. Lapse of time, it is said, and actual possession must unite. This possession, it is said, must be so open and exclusive as to amount to a disseizin, or an ouster or termination of the plaintiff's possession. Of course an occasional interruption of it would amount to nothing. He would still remain seized and possessed. The defendant must have occupied and appropriated, or taken to his use the lands by some defined boundaries. His acts must be plain and unmistakable, and such as prove an intention to use the land as owner. No other acts change the true proprietor's possession. To build upon, enclose, clear, cultivate or improve lands is to assert a right to use them as one's own. *Continued* residence is not necessary to constitute possession, where land has been so enclosed and used as to give publicity to the possession. See *Bradstreet vs. Huntington*, 5 *Peters*, 402; *Sparhawk vs. Bullard*, 1 *Metc.*, 95; *Blood vs. Wood, id.*, 535: *Potts vs. Gilbert*, 3 *Wash. C. C. R.*, 475; *Doe vs. Campbell*, 10 *John.*, 477; *Johnson*

*vs. Sevine*, 3 *Serg. & Rawle*, 291; *Jackson vs. Howe*, 14 *John.*, 405; *Barr vs. Gratz*, 4 *Wheat.*, 213; *Cummings vs. Wyman*, 10 *Man.* 464; *Ewing vs. Burnett*, 11 *Peters*, 53.

It is said that the occupation must be visible and notorious, because the statute proceeds upon the ground that there has been an acquiescence on the part of the owner; which supposition could never be indulged, if an occupation was so secret and clandestine as not to afford notice. *Angell on Lim.*, 416. The reason itself needs explanation. The owner does not lose his land because he has acquiesced in the defendant's possession, but because he has himself never had possession, or has abandoned it. That he knows of the defendant's possession, and does not resist it, is proof that the defendant's possession displaces his, and that his is abandoned. The whole is a question of fact as to the continuance or cessation of his possession. If he is disseized by force, and actual possession held against his will, and he does not retake possession, or attempt to recover it by suit, he abandons it. When he obtains absolute title, he is presumed to take possession. When he has once taken possession, and his title continues, his possession is deemed to continue. He need not daily or monthly reiterate acts of possession or proprietorship. A possession under him, or under his title, as by a tenant or lessee, is his possession. Such is the legal effect of the contract, and of the obligation to restore possession. A mere temporary trespass does not change or oust his possession. The whole question is, whether the possession taken and kept by another, does that.

Suppose now, that A is absolute owner of a tract of land, in possession, and actually residing on and otherwise actually holding the land. Under execution against him, B purchases the land. A thereby at once ceases to have any title whatever. But he remains in possession ten years, B never taking possession, nor instituting any action to be placed in possession. Immediately on B's purchase, the *right* to take possession vested in him but he did not exercise it, nor did A agree to hold as his tenant. Suppose that A *has* done no act in express denial of B's right to

possession or of his title, but has simply held possession and gone on improving and cultivating as before. As B undeniably *knows* of this possession, and does not interrupt it, he acquiesces in it. Does the estate run ·in favor of A? Is his possession adverse to B; or does the rule requiring adverse possession not apply?

In this case, B has no actual possession; and as A has, B has no constructive possession, or, which that phrase means, is not *presumed* to have actual possession; because he is *proven not* to have any. This is clear, unless the law regards A's possession as the possession of B, on the ground that he holds under him as tenant or otherwise. But A is not tenant at will of B; for a tenancy at will is where lands are let by one to another, to hold at the will of the lessor, and the tenant's possession is taken under this lease; *Litt. sec.* 68; and a tenancy at sufferance is where one gains possession of lands under another, by lawful title, as a lessee or mortgagee or the like, and keeps the lands afterwards without any title at all. In each case there is a prior recognition of the other's title, and possession is obtained under it. Therefore it was held in *Chalfin vs. Malone*, 9 *B. Mon.*, 496, that the defendant in execution does not occupy the relation of tenant or *quasi* tenant, to the purchaser, and is therefore not entitled to notice to quit, or ·demand of possession before the purchaser may bring his action. *Snowden vs. McKinney*, 7 *B. Mon.*, 259.

But the court said in *Chalfin vs. Malone*, that the possession of the defendant in execution is regarded, in the absence of all testimony manifesting the actual character of his holding, as consistent with the title of the purchaser. As there cannot be two concurrent possessions of the whole, this must mean that the defendant's possession is the purchaser's; that is, that the former holds for and under the latter. Is an agreement to that effect supposed or presumed, or does the *law* make him so hold? Neither. But, the court also said, as there is nothing in the relation of the parties, or in the attitude of the defendant, which imposes on him any obligation to hold the possession of the land for the benefit of the purchaser, or which authorizes the purchaser to rest in

security upon the belief that it is so held, there is no estoppel upon the defendant which precludes him from converting the amicable possession into one that is adverse and hostile. The law, it said, does not, merely, from the faith that he continues in possession, raise the presumption that the possession is adverse; but devolves upon him the burthen of evincing, if he rely upon it, that such have been its true nature and character.

We do not agree to this. Where one sells and conveys land to another, and remains in possession, he is deemed to hold under the vendee and as his tenant, not because the law gives him constructive possession, or presumes actual possession by him, as a consequence of his proprietorship, but because the vendor transfers to him the right of possession and binds himself to maintain him in possession, and must be deemed to have agreed to hold the possession, if he should remain in it, for and under the vendee, who had paid him for it. But no such legal conclusion follows, where B buys A's land under execution. There is no such agreement to be presumed. B buys the right of possesaion, but not from A: and as, under under our statute, B's right of action accrued as soon as he purchased, without notice to quit or demand for possession, and as he has no constructive possession, he is barred if he does not obtain actual possession within ten years. Even if adverse possession in the defendant were required, the length of his possession alone would prove it adverse. Its character depends upon his own views and intentions, not on the plaintiff's. At first, and for a reasonable time, it might be deemed indeterminate; because, it is natural, for a time, that he merely continued temporarily in possession, by the plaintiff's permission, and tacit consent, or delay to oust him, without meaning to continue permanently on the land, when no longer proprietor, and in defiance of the plaintiff's title. But that presumption would soon cease. It is easy to see why. An owner of land wants the possession and use of it, or rents for it. That is really all the interest one has in land. " *What is the land*," says Lord Coke, "*but the profits thereof*?" As little is it to be presumed that any one contin-

ues for years to reside upon land, to expend his labor and means upon it, and connect it with himself by all the ties of association, until it has a value in his eyes far beyond that of money; when he does not regard it as his own, or when there is no agreement between him and the owner, which legalizes his possession and protects him in it.

The lapse of time might also prove the possession adverse in another way. The long continued possession of the defendant, with the tacit acquiescence of the purchaser would raise the presumption that some arrangement existed between them, by which the land was really the property of the defendant notwithstanding the sale, the title being held by way of security for the debt, or otherwise, and that the debt had been paid. For limitation, proceeding on the supposition that it has been paid, would bar a suit for the *debt;* and it would be presumed that if it still remained due, or the purchaser retained any claim on the land, he would not so long sleep upon and risk the loss of his rights. And if the defendant holds the land under any agreement, inconsistent with the supposition of total want of interest in himself, and absolute title in the purchaser, his claim to the land and his possession under that claim are adverse to that title.

To recover the possession under our statute of ten years, the plaintiff must have had actual or constructive possession within that time. If the execution purchaser does not obtain actual possession, and the defendant continues in it, without agreement to hold under him, he has no constructive possession. Such is the plain meaning, and such are the peremptory terms of the statute. The courts cannot incorporate new terms into its provisions. They can only say that constructive possession is sufficient; and that, if the plaintiff proves that, then the defendant must prove, by sufficient acts, that more than ten years before suit, he took actual possession and continued it, adversely, so as to put an end to the constructive possession, and that the latter has not been renewed.

If, however, some act were necessary, or some declaration,

showing that the possession of Hawkins and those claiming under him was adverse, such acts were done. When Hawkins joined Badgett, on the 26th of May, 1846, in selling the land to Burton and conveying it to him, with covenants which guaranteed not only the absolute title in fee, but the immediate and continued exclusive possession of the lands, against all claims of all persons whatsoever, this was the clearest possible declaration that he claimed the land, or all the interest he ever had in it, as his own, and that he held the possession in his own right. Such a conveyance and covenants were utterly inconsistent with the theory that he held possession, or ever had held possession under Trapnall. If they did not fix the character of his possession as adverse from the beginning, they made it, at least, adverse from that time forward. The suit was not brought until February, 1858; and under the old statute, Trapnall's claim and that of his representatives, heirs and devisees was thus barred, at any rate, on the 26th of May, 1856. It is proven that Hawkins retained possession [which he of course did as tenant of Burton] of the north-east quarter, until Burton sold to Kimber, on the 19th of May, 1847; and that since then, Kimber and the trustees have always had undisturbed possession of the west half of the quarter. And as Hawkins had adverse possession of the east half, for Burton, until the 19th of May, 1847, at least; and Burton, sold to More on the 3d of June, 1847; and More to Dodge and Watkins in 1851 and 1852, each conveyance conveying in fee, with covenants of warranty, the same adverse possession must be presumed, in the absence of any allegation in the bill to the contrary, to have continued, and to have actually accompanied each conveyance of title.

If the suit had not been barred by the old statute, it would have been doubly barred by the new. The act of 4th January, 1851, not only bars all suits for land at the end of seven years after title or cause of action accrued, which barred Trapnall on the 4th of January, 1858; but moreover, on the 4th of January, 1851, by the first section of the act of that day, it was provided

that when any person should have had three years' possession of any lands that had been granted or patented, holding or claiming them under a deed, devise, grant or assurance, and no suit should be brought for the land within three years from the passage of the act, the possession should be an effectual bar to any action brought to recover the land, in law or equity, and should vest an absolute and indefeasible title in fee simple to the land. Whatever may be the construction of this act as to *future* cases, it is certain that, as Burton and under him More and Kimber had, on the 4th of January, 1851, had peaceable and uninterrupted possession of the whole north-east quarter for more than three years, under a deed of conveyance duly recorded, and as no suit was brought, in law or equity, by Trapnall, for the land or any part of it within three years from the passage of the act; but the one then pending was dismissed on the 22d of December, 1854, and not renewed until more than three years afterwards; the suit in this last case was not only barred, but an indefeasible title in fee simple had vested in Dodge, Watkins, and the trustees by prescription.

Apart from every other ground of defence, the bill must needs have been dismissed, on account of the incapacity of the court to decree the relief asked, if otherwise Trapnall's representative and heir had been entitled to it, for the failure to bring the necessary parties before the court. Burton, More, Vance, Hawkins and Noah H. Badgett were all necessary parties to the bill. *Brodie vs. Skelton* 11 *Ark.*, 136 ; *Wood vs. Dummer*, 3 *Mason*, 317; *Cockburn vs. Thompson*, 16 *Ves.*, 329; *Porter vs. Clements*, 3 *Ark.*, 382. For all of these, except Burton and More had an existing legal interest in the lands whereof partition was asked; and Burton was grantor of Kimber, and More of Dodge and Watkins, each bound by the full covenants of his conveyance.

No process being sued out against these parties, there could be no decree, either for partition, or for the whole title to the west half of the north-east quarter. To decree the latter, it was necessary to establish against Vance, Hawkins and Badgett the

parol agreement of partition relied on in the bill, under which alone Hawkins could have been held sole proprietor of that separate tract. There was no suit against the parties named; or if there was, it should have been dismissed as to them before the hearing. The case stood precisely as if the bill had not sought to make them parties, and therefore the court was powerless to grant the relief prayed for.

Nor was the will of Trapnall produced at the hearing to prove the representative character of Martha F. Trapnall, or the right of Mary R. Trapnall under it. Even as to the defendants who answered, and who did not deny that there was a will, or that Martha F. Trapnall was executrix, or that Mary R. was sole heir of Trapnall, the case was not helped, because to admit that the latter was his *heir*, was not to admit that she had any rights in the land in question under the will; the tenor or substance of the will not being stated, nor any allegation made that the land was devised to her. In short, the bill was so radically defective that no decree for relief could be based upon it.

In favor of the trustees of the college, the court was constrained to dismiss the bill on another ground. If a person who has the claim to, or is the owner of, property real or personal, stands by and permits it to be sold, without giving notice of or asserting his right, he is estopped from setting up his claim or title, against the purchaser. *Shall vs. Biscoe.* 18 *Ark.* 142; *Corbett vs. Norcross*, 35 *N. Hamp.*, 99; *Storrs vs. Barker*, 6 *J. C. R.*, 344.

"There is no principle," said Chancellor KENT, in *Wendell vs. Van Rensselaer*, 1 *J. C. R.*, 354, "better established in this court, nor one founded on more solid considerations of equity and public utility, than that which declares, that if one man, knowingly, though he does it passively, by looking on, suffers another to purchase and expend money on land, under an erroneous opinion of title, without making known his claim, he shall not afterwards be permitted to exercise his legal right against such person. It would be an act of fraud and injustice; and his conscience is

bound by this equitable estoppel. *Qui tacet, consentire videtur. Qui potest et debet vetare, jubet.*"

A stronger case for the application of this salutary doctrine than this, could not well be imagined. Even Trapnall's mere silence would have been strangely significant, when he had so long left Hawkins and those claiming under him in possession, and no agreement between him and Hawkins is shown, with which this is consistent. It was inconsistent with the hypothesis of absolute proprietorship in Trapnall; and the presumption, continually strengthening, and on which third persons might well act, was that Hawkins continued to own the land, under some secret agreement between him and Trapnall, or that the judgment had been paid.

A man is estopped when he has done some act, which the policy of the law, or good faith, will not permit him to gainsay or deny, and when the principle of estoppel is understood, and unwise legislation or decision does not push the doctrine beyond reasonable limits, it is one of the wisest and most just and righteous doctrines of the law. The whole principle of equitable estoppel is, that when a man has deliberately done an act or said a thing, and another person, who had a right to do so, has relied on that act or word, and shaped his conduct accordingly, and will be injured if the former can repudiate the act or recall the word, it shall not be done; but, of whatever things the act was evidence, in the nature of things, and on ordinary principles, it shall be taken to be *conclusive* evidence; and what was said, the party shall not deny to have been true.

When the trustees were about purchasing the west half of the north-east quarter, not for themselves, but as a site on which to erect a public and charitable institution of learning, they knew of Trapnall's claim, and of his then pending suit. They informed him of the intended purchase, he himself being warmly interested in the enterprise of establishing the college. They told him that they should not purchase, if he intended enforcing his claim. He told them that he neither wanted or expected to recover the land

itself, but to compel the payment of a sum of money due by Hawkins, and which Rector had assumed to pay, but claiming to have the right to set off certain costs against it. He declared that he would place no obstacle in the way of the purchase. The trustees believed him, and relying on these assurances made the purchase.

These positive assurances, coupled with his long delay in asserting his right to possession, and availing himself of his legal title, with his indifference to the continuous possession of Hawkins and to his conveyance to Burton, and Burton's to Kimber, made it neither a wrongful or imprudent act in the Trustees to purchase the property, and proceed to erect the college upon it. It is not probable that Trapnall himself would ever have impeached their title, and voluntarily have placed himself in the unenviable position which he would have occupied by doing so: for he virtually abandoned his pending suit, by not amending his bill, after he had obtained leave to do so. The estoppel would be perfectly conclusive in favor of an individual, and where pecuniary interests alone were involved. It is more so when relied on, as it is here, where the interests of all the people of the state are concerned, and where the purposes of the charitable and philanthropic would be thwarted, and an infant institution of learning destroyed, by permitting the representative or heir of a party to set up a pretext of title which he had disclaimed, so making him to have perpetrated a deliberate fraud, of which it is evident he never dreamed of being guilty.

On these grounds the decree of the chancellor dismissing the suit, was correct. The decree dismisses the bill, for want of equity: but the chancellor heard the whole case and decided it, in reality, on the pleadings and evidence, though there was, on account of its many defects, no equity on the face of the bill, and no relief could have been granted upon it. The dismissal should be equivalent to a judgment in bar: and the decree will be affirmed, with the further decree that it operate as a perpetual bar against all claim of any person or persons, under the said

27

purchase of the said Frederic W. Trapnall, and as his representatives, heirs or devisees, to any part of the lands originally patented to Noah H., Jesse B. and William Badgett and Richard C. Hawkins, as the same lands are described in the pleadings in this case.